UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NUA GJOKAJ,

              Plaintiff,                          Civil Case No. 14-14151
                                                Honorable Linda V. Parker

v.

UNITED STATES STEEL CORPORATION,

              Defendant.

_____/

## OPINION AND ORDER (1) DENYING PLAINTIFF'S MOTION TO STRIKE DEFENDANT'S EXHIBITS; (2) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; AND (3) DENYING AS MOOT PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

This lawsuit arises from Defendant United States Steel Corporation's termination of Plaintiff Nua Gjokaj ("Plaintiff"), after Plaintiff partially amputated his finger in a work-related accident and then failed to follow directives instructing him to report to the medical department and misrepresented the condition of his finger. In his Complaint, filed October 28, 2014, Plaintiff alleges the following claims against Defendant: (I) disability discrimination in violation of the Americans with Disabilities Act ("ADA"); (II) disability discrimination in violation of Michigan's Persons with Disabilities Civil Rights Act ("PDCRA"); (III) interference with Plaintiff's rights and denial of leave under the Family

Medical Leave Act of 1993 ("FMLA"); and (IV) violation of the Michigan Workers' Disability Compensation Act of 1969 ("WDCA").  (ECF No. 1.)

Presently before the Court are cross-motions for summary judgment filed by the parties on February 29, 2016.  (ECF No. 39, 40.)  In its motion, United States Steel Corporation ("USS") seeks summary judgment with respect to all of Plaintiff's claims.  (ECF No. 39.)  Plaintiff seeks summary judgment only as to the issue of whether Plaintiff was disabled within the meaning of the ADA.  (ECF No. 40.)  Also before the Court is Plaintiff's motion asking the Court to strike several exhibits attached to USS's motion.  (ECF No. 48.)  The motions have been fully briefed.  Finding the facts and legal arguments sufficiently presented in the parties' pleadings, the Court issued a notice on August 1, 2016, dispensing with oral argument pursuant to Eastern District of Michigan Local Rule 7.1(f).  For the reasons that follow, the Court is denying Plaintiff's motion to strike USS's exhibits, granting USS's motion for summary judgment, and denying as moot Plaintiff's motion for partial summary judgment.

## I.      Plaintiff's Motion to Strike USS's Exhibits

As Exhibits 32, 33, 36, 37 and 38 to its motion for summary judgment, USS attaches several documents created during the grievance proceedings related to Plaintiff's termination.  Exhibit 32 contains the hand-written notes of the first step grievance hearing created by USS Legal Relations employee Michael Simpson.

2

Exhibit 33 is the minutes from the second step hearing.  Exhibit 36 is Simpson's handwritten notes from the second step hearing.  Exhibit 37 is the position statement for the third step hearing prepared by the union representing Plaintiff. Finally, Exhibit 38 contains USS Legal Relations employee Jennifer Hickey's handwritten notes from the step three hearing.

Plaintiff argues that these exhibits are inadmissible under Federal Rule of Evidence 408 as "offers of compromise."  Plaintiff maintains that the Court should strike exhibits created by Simpson, who has passed away, because they also lack an evidentiary foundation.  Alternatively, Plaintiff contends the exhibits are inadmissible because they are "riddled with inadmissible hearsay."

The Court's decision with respect to USS's summary judgment motion would be the same regardless of whether the Court excluded or considered the evidence presented in USS's Exhibits 33, 36, 37, and 38.  Therefore, the Court finds it unnecessary to rule on the admissibility of those exhibits and will not consider them.  The Court, however, will address USS's Exhibit 32.

Federal Rule of Evidence 408 provides that compromise offers and negotiations are not admissible to "prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction[.]"  However, the court "may admit this evidence for another purpose[.]" Fed. R. Evid. 408(b).

3

No compromise was offered, nor did compromise negotiations occur, at the first step grievance hearing, the notes of which are submitted as Exhibit 32 to USS's motion for summary judgment.  Thus, the Court does not find the evidence contained in the exhibit inadmissible under Rule 408.  Moreover, "[b]ecause the purpose of Rule 408 is to encourage the compromise and settlement of *existing* disputes," *Josephs v. Pacific Bell*, 443 F.3d 1050, 1064 (9th Cir. 2005) (emphasis added), courts have held that the rule does not come into play with respect to offers of compromise or compromise negotiations occurring before or at the time of termination and before litigation has been initiated.  *See, id.* (finding that the district court did not abuse its discretion by admitting statements made by the defendant's employees at the plaintiff's grievance proceeding because "the grievance proceeding did not concern [the plaintiff]'s not-yet-filed discrimination claim"); *see also Cassino v. Reichhold Chems., Inc.*, 817 F.2d 1338, 1342-43 (9th Cir. 1987) (concluding that Rule 408 did not preclude the admission of a "Settlement Agreement and General Release" the defendant offered the plaintiff at the latter's termination meeting); *Mitchell v. Cnty. of Wayne*, No. 05-73698, 2007 WL 850997, at *3 (E.D. Mich. Mar. 16, 2007) (unpublished) (denying the plaintiff's motion to exclude evidence of an offer made at the arbitration hearing conducted when the plaintiff's union grieved his termination, because Rule "408 does not bar offers made prior to the filing of a claim, especially when [the

4

p]laintiff had not yet been terminated from his employment."). For these reasons, the Court concludes that Rule 408 does not preclude the admission of the hand-written notes from the step one hearing.

Nor is Exhibit 32 inadmissible due to the lack of an evidentiary foundation. Plaintiff contends that such a foundation cannot be laid because Simpson, the author of the hand-written notes, passed away in December 2013. Simpson, however, is not the only individual capable of providing the necessary foundation testimony. USS indicates that Jennifer Hickey, the Manager of its Labor Relations Department, is able to testify that Simpson created the hand-written notes as part of the grievance process, in accordance with their department's standard practice. (ECF No. 50 at Pg ID 1530-31.) Hickey also can provide the testimony needed to establish that Exhibit 32 is admissible under the business records exception to the hearsay rule set forth in Federal Rule of Evidence 803(6).

Hearsay evidence generally is not admissible. Fed. R. Evid. 801(c) and 802. Hearsay within hearsay also is not admissible unless "each part of the combined statements conforms within an exception to the rule." Fed. R. Evid. 805. Rule 803 provides an exception to the hearsay rule for records of regularly conduct activity, commonly referred to as the "business records" exception. Fed. R. Evid. 803(6).

To be admissible under the business records exception, the record must (1) be "created in the course of a regularly conducted business activity," (2) "kept in

5

the regular course of that business," (3) result from a "regular practice of the business to create such documents, and (4) be "created by a person with knowledge of the transaction or from information transmitted by a person with knowledge." *Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*, 774 F.3d 1065, 1071-72 (6th Cir. 2014)  "A custodian or otherwise qualified witness must attest that the proffered document meets these conditions." *Id.* (citing Fed. R. Evid. 803(6)(D)).

To be considered an "otherwise qualified witness" under Rule 803(6), "all that is required of the witness is that he or she is familiar with the record keeping procedures of the organization." *United States v. Jenkins*, 345 F.3d 928, 935 (6th Cir. 2003).  " 'Rule 803(6) does not require that the custodian personally gather, input, and compile the information memorialized in a business record.' " *Id.* (quoting *United States v. Weinstock*, 153 F.3d 272, 276 (6th Cir. 1998)). Additionally, the individual "need not be in control of or have individual knowledge of the particular corporate records[.]" *Id.*

USS indicates that Hickey, as Labor Relations Manager and Simpson's supervisor, is fully familiar with the discipline and record-keeping procedures of the department and can attest that Simpson's handwritten notes meet the conditions for admission under Rule 803(6).  The statements by Plaintiff and his union representatives in the record-- which are the only statements the Court finds relevant in deciding USS's pending summary judgment motion-- are admissible

6

under Federal Rule of Evidence 801(d), as admissions by a party opponent. *See* Fed. R. Evid. 801(d)(2)(A), (C), (D) (including as statements that are not hearsay: a statement offered against an opposing party that was (A) "made by the party"; (C) "was made by a person whom the party authorized to make a statement on the subject"; or (D)"was made by the party's agent or employee on a matter within the scope of that relationship and while it existed[.]"). The Court, therefore, is denying Plaintiff's motion to strike Exhibit 32 to USS's motion for summary judgment and is denying as moot Plaintiff's motion to strike Exhibits 33, 36, 37, and 38.

## II. Summary Judgment Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

7

The movant has the initial burden of showing "the absence of a genuine issue of material fact." *Id*. at 323.  Once the movant meets this burden, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).  To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient.  *See Liberty Lobby*, 477 U.S. at 252.  The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255.

"A party asserting that a fact cannot be or is genuinely disputed" must designate specifically the materials in the record supporting the assertion, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1).  Notably, the trial court is not required to construct a party's argument from the record or search out facts from the record supporting those arguments.  *See, e.g., Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir.1989) ("the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact") (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)); *see also InterRoyal Corp. v.*

8

*Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied* 494 U.S. 1091 (1990)

("A district court is not required to speculate on which portion of the record the

nonmoving party relies, nor is it obligated to wade through and search the entire

record for some specific facts that might support the nonmoving party's claim.").

The parties are required to designate with specificity the portions of the record

such that the court can "readily identify the facts upon which the . . . party

relies[.]" *InterRoyal Corp.*, 889 F.2d at 111.

Courts evaluate cross motions for summary judgment under the same

standard. *La Quinta Corp. v. Heartland Props., LLC*, 603 F.3d 327, 335 (6th Cir.

2010) (citing *Beck v. City of Cleveland*, 390 F.3d 912, 917 (6th Cir. 2004)). When

faced with cross- motions for summary judgment, each motion is examined on its

own merits. *Id*.

## III.   Factual Background

In June 2011, USS hired Plaintiff for an entry-level position at its Great

Lakes Works facility in Ecorse and River Rouge, Michigan.  (Pl.'s Dep. at 18.)  In

this position, Plaintiff was a member of the United Steel Workers Union ("Union")

and subject to the terms of the Basic Labor Agreement ("labor agreement")

between the Union and USS.  (Def.'s Mot., Ex. 8.)  Plaintiff also was subject to

USS's General Safety and Plant Conduct Rules and Regulations ("Rules and

Regulations").  (*Id*., Ex. 9.)

9

On November 29, 2011, Plaintiff injured his back at work. (Pl.'s Dep. at 20; Def.'s Mot., Ex. 10.) Plaintiff immediately was taken to "Plant Medical" at the Great Lakes Works facility for evaluation, and then was released to return to work activity as tolerated. (Pl.'s Dep. at 21; Def.'s Mot., Ex. 11.) Plaintiff worked the remainder of his regular shift on November 29, and volunteered to work the next shift, without incident. (Pl.'s Dep. at 24; Def.'s Mot., Ex. 12.)

The following day, however, Plaintiff's back condition worsened and the medical doctor at Plant Medical, Susan Madden, sent him for an MRI. (Def.'s Mot., Ex. 13.) Plaintiff was experiencing a lot of pain and numbness in his left leg, which caused him to have to "throw his leg in front of him" to walk. (*Id*.) MRIs on November 30 and December 2, 2011, showed a disc protrusion in Plaintiff's spine, for which a neurosurgeon recommended surgery. (*Id*.) Plaintiff refused surgical intervention, and even refused to take any medication for his pain. (*Id*.)

Plaintiff's condition was monitored through regular appointments at Plant Medical, where he was seen by Dr. Madden and other medical staff. Dr. Madden placed Plaintiff on sedentary work with no lifting over twenty pounds or repetitive bending. (Def.'s Mot., Ex. 13.) Plaintiff's lifting restriction was modified to forty pounds on November 30, 2012, by which time his back condition had improved. (*Id*., Ex. 15; Pl.'s Dep. at 31, 43.)

10

Around this time, Plaintiff applied to enter an 18-month Learner Program to be a USS Maintenance Technician Mechanic. (Pl.'s Dep. at 34.) USS accepted Plaintiff into the program, which was a promotion for him. (*Id*.) The program involved classroom and on-the-job training at various locations at the Great Lakes Works facility. (*Id*. at 35-37.) Plaintiff did not have a regular supervisor at this time, but reported to the supervisor in the location to which he was assigned. (*Id*. at 35, 38-39.)

On Thursday, July 24, 2013, at approximately 4:30 p.m., Plaintiff injured his right middle finger when another employee actuated a machine, catching the tip of Plaintiff's gloved finger in a pinch point. (*Id*. at 53-55, 98-99.) The tip of Plaintiff's finger was cut nearly all the way through. (*Id*. at 57-58; Def.'s Mot., Ex. 19.) Plaintiff reported the incident to Todd Chartier, a supervisor where he was working, and requested that Chartier call EMS. (Pl.'s Dep. at 59-62.) At approximately 4:33 p.m., Chartier contacted Plant Medical to report the incident. (Def.'s Mot., Ex. 16 at Pg ID 693; Pl.'s Dep. at 62-63, 65; Benitez Dep. at 41.) Plant Medical Nurse John Benitez told Chartier to call Plant Security for an EMS transport to Henry Ford Hospital in Wyandotte. (Benitez Dep. at 40-41; Chartier Dep. at 36; Def.'s Mot., Ex. 17.) Nurse Benitez, who was monitoring the incident over the plant radio, made a note indicating that Chartier contacted Plant Security and that an EMS unit was dispatched to the plant at 4:40 p.m. (Benitez Dep. at 41-

11

42; Def.'s Mot., Ex. 17.)  The EMS unit transported Plaintiff to the hospital, which recorded his arrival time as 5:09 p.m.  (Def.'s Mot., Exs. 17, 18.)

Plaintiff was seen in the hospital emergency room, where his finger was cleaned, stitched, and splinted.  (*Id.*; Pl.'s Dep. at 75, 90.)  The hospital record provides the following final diagnosis: "Acute crush injury to right middle finger, acute complete nail avulsion with nail bed injury, acute distal phalangeal comminuted fracture."  (Def.'s Mot., Ex. 18 at Pg ID 703.)  Plaintiff was instructed to follow-up with a hand surgeon the next day.  (*Id.*)

After his release from the hospital, Plaintiff was transported back to Plant Medical.  (Pl.'s Dep. at 77.)  By this time of day, Dr. Madden no longer was at the clinic to evaluate Plaintiff.  (*Id.* at 79.)  Therefore, according to the standard practice within Plant Medical, Nurse Benitez, the nurse on duty, instructed Plaintiff to return for an appointment with the doctor at 7:00 a.m. the next morning, Friday, July 25.  (*Id.* at 79-80; Benitez Dep. at 57-58, 81.)  Nurse Benitez told Plaintiff that, because it was a work-related injury, this was the procedure they needed or wanted him to follow so USS could provide medical care for him.  (Benitez Dep. at 58; *see also* Toland Dep. at 29.)  During his deposition in this matter, Nurse Benitez explained that employees are instructed to come at 7:00 a.m. because this is the earliest time available for Dr. Madden to see them and thus there is no delay in

treatment.  (Benitez Dep. at 81.)  Plaintiff's regular start time also is at 7:00 a.m.

(Pl.'s Dep. at 8-9.)

According to Nurse Benitez, Plaintiff became "very defensive and

argumentative" when instructed to return in the morning, indicating that he was not

going to.  (Benitez Dep. at 57.)  Plaintiff told Nurse Benitez that Dr. Madden was

not going to do anything for him, even after Nurse Benitez explained that Dr.

Madden would make sure Plaintiff received the care he needed and would

probably be referring Plaintiff to a specialist to get the best care possible.  (*Id*. at

62-63.)  Angela Toland, who works as a Medical Assistant at Plant Medical,

testified that Nurse Benitez advised Plaintiff that proper procedure is for Plaintiff

to see Dr. Madden the next morning, and that this is USS's rule.  (Toland Dep. at

29-30.)  According to Toland, Plaintiff also indicated that unless they were going

to pay for his gas, he was not wasting his time to come to the appointment and that

he would rather see his own doctor.  (*Id*.)  Nurse Benitez called his supervisor,

Nurse Manager Laura Lieb, asking that she speak to Plaintiff and encourage him to

return in the morning to see Dr. Madden.  (Benitez Dep. at 66; Toland Dep. at 30;

Lieb Dep. at 142.)

When Plaintiff got on the phone with Nurse Manager Lieb, she reiterated

that Plaintiff needed to see Dr. Madden in the morning so Plant Medical could do

follow-up treatment and care, including referring Plaintiff to a hand surgeon.  (Lieb

13

Dep. at 142-43.)  According to Lieb, she warned Plaintiff that if he did not follow Plant Medical's instruction, his medical bills might not be paid because the injury was compensable under the workers' compensation law.  (*Id*. at 149, 152; Def.'s Mot., Ex. 20.)  She also told Plaintiff that he could be disciplined for failing to follow a medical directive, up to and including discharge.  (Lieb Dep. at 142-43; Def.'s Mot., Ex. 20.)  Plaintiff told Lieb that he was not coming to see Dr. Madden, he did not want to spend the gas money to get there, and was going to see his own doctor.  (Lieb Dep. at 144; Toland Dep. at 30.)  Nurse Manager Lieb told Plaintiff he needed to see Dr. Madden at Plant Medical, first.  (Pl.'s Dep. at 79-80, 83-86.)

Plaintiff did not ask Nurse Manager Lieb or Nurse Benitez for a different or later appointment time with Dr. Madden.  (Benitez Dep. at 128; Lieb Dep. at 141-42, 144.)  Benitez and Lieb testified that if Plaintiff had made such a request, they would have accommodated him.  (Benitez Dep. at 80-81; Lieb Dep. at 144.)  Their impression was that Plaintiff was not coming in at all.  (*Id*.)

When Plaintiff returned the phone to Nurse Benitez, Nurse Manager Lieb told Nurse Benitez that she was not able to convince Plaintiff to come in the next day.  (Benitez Dep. at 86.)  Nurse Manager Lieb also told Nurse Benitez to make sure she wrote up the status report returning Plaintiff to his regular job, with no modification at this time, and indicating that Plaintiff knows Plant Medical wants him there at 7:00 a.m.  (*Id*.)  Nurse Manager Lieb contacted Stephen Kovalchik in

14

Labor Relations that evening, reporting what was going on with Plaintiff,

specifically that "she was having difficulty getting [Plaintiff] to agree to come in"

to Plant Medical.  (Kovalchik Dep. at 102; *see also* Hickey Dep. at 80-81.)

Plaintiff did not report to Plant Medical at 7:00 a.m. the following morning,

Friday, July 25.  (Pl.'s Dep. at 87; Def.'s Mot., Ex. 21.)  According to his

deposition testimony, he stayed home and did not go anywhere.  (Pl.'s Dep. at 87-

88)  Dr. Madden called Plaintiff's cell phone at 7:40 a.m. and left a message.

(Def.'s Mot., Exs. 22, 23.)  At 10:00 a.m., Plaintiff called Plant Medical and spoke

with Dr. Madden.  (*Id*., Exs. 21, 22).

According to the notes Dr. Madden made in USS's Health Information

Management System ("HIMS"), Plaintiff called seeking authorization to be seen at

a medical clinic on Schoenner Road.  (*Id*. Ex. 21 at Pg ID 715.)  Dr. Madden

denied Plaintiff's request, indicating that he needed to come to Plant Medical to be

evaluated and that they could not authorize anything until he had been seen.  (*Id*.)

Dr. Madden also told Plaintiff that they had a hand surgeon to take care of him.

(*Id*.)  Plaintiff told Dr. Madden that his brother-in-law had driven him to the

Schoenner clinic, was working now, and he could not get to Plant Medical.  (*Id*.)

Dr. Madden informed Plaintiff that USS would call and pay for a taxi to get him

there, but Plaintiff declined the offer.  (*Id*.)  When Dr. Madden gave the phone to

Nurse Manager Lieb to speak with Plaintiff, Plaintiff hung up.  (*Id*.)

15

Dr. Madden then reviewed Plaintiff's hospital records and wrote in HIMS: "It looks like [Plaintiff] suffered a partial amputation of the distal right middle finger, at the base of the fingernail, the volar skin sounds like it is still intact[.]" (Def.'s Mot. at Ex. 21.)  Dr. Madden wrote further, "considering this is repaired, and that it is only the fingertip, [Plaintiff] is able to do one handed or sedentary duty at the training center."  (*Id*.)  Dr. Madden indicated that he would "try to reach [Plaintiff] again tomorrow" and that "at some point, he will have to see us," but he concluded:

> his finger has been repaired, he has his tetanus shot and antibiotics, and pain relief.  All that needs to be done it [sic] to look to make sure the finger tip is healing without complication.  Will follow.  Will authorize ortho eval when he returns to medical.

(*Id*.)

USS considered Plaintiff's failure to appear for his appointment that day as directed to be insubordination.  (Def.'s Mot., Ex. 29.)  As a result, USS issued a Notification of Discipline on July 25, suspending Plaintiff for five days.  (*Id*.)

Plaintiff did report to Plant Medical at around noon on Friday, July 25.  (*Id*.) At that time, Dr. Madden referred Plaintiff for further evaluation to Dr. Leo Ottoni, an orthopedic hand surgeon, and an appointment was scheduled for Plaintiff that afternoon.  (*Id*.)  Dr. Madden instructed Plaintiff to return to Plant Medical at 7:00 a.m. the next morning.  (*Id.*)

16

Dr. Ottoni diagnosed Plaintiff as having a partial amputation of his right middle finger and a fracture of the distal phalanx. (Def.'s Mot., Ex. 26.) Dr. Ottoni released Plaintiff to return to work on July 26, with the restriction that he not be assigned work requiring use of his right upper extremity. (*Id.*)

When Plant Medical had not heard from Plaintiff by 3:00 p.m. on July 25, Nurse Manager Lieb called Plaintiff.[1] (Lieb Dep. at 192; Def.'s Mot., Ex. 22 at Pg ID 725.) According to Lieb, Plaintiff stated he was at Dr. Ottoni's office, his finger could not be saved, and he was waiting to be transported to Henry Ford Hospital in Wyandotte for Dr. Ottoni to cut it off. (Lieb Dep. at 192; Def.'s Mot., Ex. 25 at Pg ID 736; Pl.'s Resp., Ex. S; Kovalchik Dep. at 103-04.) Lieb reported that Plaintiff also told her he now would only be able to count to nine and a half, not ten. (Lieb Dep. at 192; Def.'s Mot., Ex. 25 at Pg ID 736.) Lieb told Plaintiff she was sorry and instructed him to report to Plant Medical following the procedure. (Def.'s Mot., Ex. 25 at Pg ID 736.) At his deposition in this matter, Plaintiff denied receiving a call from Nurse Manager Lieb and making these statements to her. (Pl.'s Dep. at 149-50.)

---

[1] In response to USS's motion, Plaintiff contends that there is no record of a call from Nurse Manager Lieb to Plaintiff on the afternoon of July 25. Plaintiff is incorrect. A printout of calls to and from Plaintiff's cell phone reflect an incoming call on July 25 at 3:01 p.m., which lasted approximately two and a half minutes. (Def.'s Mot. Ex. 22 at Pg ID 725.) USS represents that the calling number is Nurse Manager Lieb's office number. (Def.'s Reply Br. at Pg ID 1546.)

Plaintiff returned to Plant Medical at 7:40 p.m. on July 25, with his hand covered by a brown paper bag and secured with tape.  (*Id.* at Pg ID 737; Toland Dep. at 39-41; Benitez Dep. at 101; Pl.'s Dep. at 107-08, 154.)  Nurse Benitez and Nurse Assistant Toland were on duty at the time.  (*Id.*)  Benitez and Toland claim that in a "sad tone with a very sad expression on his face," Plaintiff told them that they had "to take it off.  They couldn't save the finger."  (Def.'s Mot., Ex. 25 at Pg ID 737; *see also* Benitez Dep. at 102, 105; Toland Dep. at 44-45.)  Plaintiff said the finger had to be cut off because it was too infected from the grease and dirt.  (*Id.*)  Nurse Benitez told Plaintiff that he needed to come to Plant Medical the next morning to see Dr. Madden, especially with the amputation, so they could make sure he received the best care possible. (Benitez Dep. at 105-06.)  Plaintiff became upset, asking why he should come there, and stating that USS should spend twenty dollars and come see him.  (*Id.*)  Nurse Benitez called Nurse Manager Lieb and told her what happened.  (*Id.* at 102.)

At his deposition in this matter, Plaintiff had no recollection of returning to Plant Medical after his appointment with Dr. Ottoni.  (Pl.'s Dep. at 151.)  However, he denied telling the on-duty nurse at Plant Medical that his finger had to be amputated.  (*Id.*)

Plaintiff did not report to Plant Medical at 7:00 a.m. on July 26, 2013.  (Pl.'s Dep. at 88, 109-110; Ex. 25 at Pg ID 736.)  At 8:10 a.m., he called Plant Medical

18

and reported that he was weak and did not feel safe driving.  (Pl.'s Dep. at 110;

Def.'s Mot., Ex. 22.)  Dr. Madden offered to send a taxi to get Plaintiff, and

Plaintiff indicated that he had no problem with that.  (Pl.'s Dep. at 110.)  Plaintiff

arrived by taxi at Plant Medical at around noon on July 26, with his hand still

wrapped in the paper bag.  (Def.'s Mot., Ex. 25 at Pg ID 736.)

When he arrived, Plaintiff flashed his hand in the doorway where Assistant

Nurse Toland was sitting and said, "just kidding, I got you."  (Toland Dep. at 44.)

Toland asked Plaintiff what he meant.  (*Id*.)  Plaintiff told her: "I have my finger.

It's not gone."  (*Id*. at 46.)  Dr. Madden ordered an x-ray of Plaintiff's finger,

which confirmed that the finger remained intact.  (*Id*.; Def.'s Mot. Ex. 21.)  Dr.

Madden again noted Plaintiff was "capable of doing one-handed work, any time

post injury."  (*Id*., Exs. 21, 27.)

Nurse Manager Lieb reported Plaintiff's failure to appear as directed at Plant

Medical on July 26, as well as his misrepresentation of his medical condition, to

Stephen Kovalchik in Labor Relations.  (Kovalchik Dep. at 103-06, 136-37.)

Kovalchik reported the misconduct to USS Labor Relations Manager Jennifer

Hickey.  (*Id*. at 129; Hickey Dep. at 45.)  Hickey assigned the matter to Labor

Relations Representative Michael Simpson for investigation and follow-up.

(Hickey Dep. at 39; Def.'s Mot., Ex. 30.)  Simpson obtained written statements

from Lieb, Benitez, and Toland, who each provided that Plaintiff refused to appear

19

in Plant Medical as directed on July 26 and misrepresented his medical condition the day before by stating that his finger had been "cut off." (Def.'s Mot., Ex. 25.) Concluding that Plaintiff engaged in insubordination by failing to follow a medical directive and by misrepresenting his medical condition, Simpson issued two additional five-day suspensions to Plaintiff on July 29, 2013. (*Id.*, Ex. 31.)

Plaintiff's union grieved his three disciplines. (Pl.'s Dep. at 103.) Under the labor agreement, the first step of the grievance procedure is a fact-finding hearing, referred to as a "9-B Hearing." (Def.'s Mot., Ex. 8 at 111.) The 9-B Hearing was held on August 2, 2013. (*Id.*, Ex. 32.) The hearing was attended by Simpson, Plaintiff, and four union representatives. (*Id.*, Ex. 32.)

At the hearing, Plaintiff did not dispute that he failed to appear at Plant Medical at 7:00 a.m. on July 25 and 26, as directed. (*Id.* at Pg ID 754-755.) He took the position, however, that no harm was done, because he appeared at some point on both days. (*Id.* at Pg ID 755) Plaintiff initially denied telling Nurse Manager Lieb that his finger was being cut off. (*Id.*) However, he then claimed it was just a misunderstanding and that he might have said that it was cut off because it was cut off to him. (*Id.*) The union contended that Plaintiff simply was playing a joke on Plant Medical personnel, as he knew they eventually would find out that his finger had not been amputated. (*Id.*)

20

Following the hearing, Simpson made the decision to convert Plaintiff's suspensions to a discharge as allowed for under the labor agreement. (Def.'s Mot., Ex. 34, Ex. 8 at Pg ID 658; Hickey Dep. at 29.) On August 8, 2013, Simpson signed Notifications of Discipline Status, informing Plaintiff that his suspensions had been converted to discharge effective that date. (Def.'s Mot., Ex. 34.)

The union appealed Plaintiff's discharge, which led to a step two hearing held August 22, 2013. (Def.'s Mot., Exs. 33, 35, 36.) Following the hearing, Simpson upheld Plaintiff's termination. (*Id.*, Ex. 33.) A step three hearing was held before Hickey on November 19, 2013, who upheld the step two decision. (Def.'s Mot., Ex. 38.) Plaintiff's union demanded arbitration, but subsequently withdrew its arbitration demand. (*Id.*, Ex. 39.)

## IV.    Applicable Law and Analysis

### A.    Disability Discrimination

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Claims under the PWDCRA "essentially track those under [the ADA]." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 n. 3 (6th Cir. 1996), abrogated on other grounds by *Lewis v. Humboldt*

21

*Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012) (en banc).  Plaintiffs alleging disability discrimination under the ADA or PWDCRA may prove their claims through direct or circumstantial evidence.  When direct evidence is lacking, as is the case here, the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies.  *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008).

Under the *McDonnell Douglas* framework, a plaintiff first must demonstrate a prima facie case of disability discrimination by showing: (1) he is disabled; (2) he is otherwise qualified to perform the essential functions of a position, with or without accommodation; and (3) he suffered an adverse employment action because of his disability.  *Id.*  The plaintiff's disability must be a "but for" cause of the adverse employment action.  *Lewis*, 681 F.3d at 321.  If the plaintiff proves a prima facie case of disability discrimination, the burden falls to the defendant "to articulate a legitimate, nondiscriminatory reason" for the adverse action.  *Talley*, 542 F.3d at 1105 (internal quotation marks and citation omitted).  If the defendant articulates such a reason, "the plaintiff must show by a preponderance of the evidence that the proffered explanation is a pretext for discrimination."  *Id.*

22

USS contends that it is entitled to summary judgment because, even assuming Plaintiff is disabled,[2] he cannot show that his disability was a "but for" cause of his termination.  USS contends that Plaintiff's termination was not based on his disability, but rather his failure to follow directives instructing him to appear at Plant Medical on two occasions and his misrepresentation of his medical condition by claiming that his finger had been amputated.  Simpson decided to terminate Plaintiff, a decision which Hickey upheld; and USS argues that even if Simpson and Hickey erred in crediting Lieb's, Benitez's, and Toland's version of the events, Plaintiff presents no evidence suggesting Simpson or Hickey made their decisions because of Plaintiff's disability.

Simpson made the decision to terminate Plaintiff based on Plaintiff's failure to follow a directive on two occasions, which constituted insubordination, and on his misrepresentation of his medical condition.  (*See* Def.'s Mot., Ex. 34.)  Plaintiff did not deny (and does not now deny) that he failed to appear at Plant Medical, as directed, at 7:00 a.m. on July 25 and 26.  With respect to the misrepresentation of his medical condition, Plaintiff claims in this litigation that he never told Nurse

---

[2] At his deposition, Plaintiff indicated he is basing his disability discrimination claim on his back injury, not his finger injury.  (Pl.'s Dep. at 165, 181.)  Plaintiff, however, asks the Court to find him disabled as a result of his back injury *and* finger injury in his motion for partial summary judgment.  (ECF No. 40 at Pg ID 793.)  Although the Court probably would not find Plaintiff disabled because of his finger injury, for purposes of resolving USS's motion, it is assuming that both conditions qualified Plaintiff as a person with a disability.

23

Manager Lieb, Nurse Benitez, or Nurse Assistant Toland that his finger had to be cut off.  Nevertheless, before Simpson made the decision to terminate Plaintiff and Hickey affirmed the termination, Plaintiff had not denied making the statement. Instead, Plaintiff admitted that he "might have said that" but claimed he did so because, to him, it was cut off and he was "joking."

The Sixth Circuit has held that where an "employer made a reasonably informed and considered decision before taking an adverse employment action[,]" the "employer is entitled to 'summary judgment on pretext even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless.' " *Loyd v. St. Joseph Mercy Oakland*, 766 F.3d 580, 590-91 (2014).  "[T]o rebut an employer's invocation of "th[is] honest-belief] rule, the plaintiff must offer some evidence of 'an error on the part of the employer that is too obvious to be unintentional.' " *Id*. at 591 (quoting *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 286 (6th Cir. 2012)).  Plaintiff does not offer such evidence here, but argues that the rule is inapplicable pursuant to *Staub v. Proctor Hospital*, 562 U.S. 411 (2011), because the grounds for the disciplinary action arose from a supervisor motivated by discriminatory animus.  Plaintiff contends that Nurse Manager Lieb "seized upon the opportunity to get rid of [Plaintiff] . . . because of his history of disability with USS."  (Pl.'s Resp. Br. at 28.)  Plaintiff offers no evidence, however, to support his

24

assertion that Lieb or anyone else who played a role in his termination was motivated by discriminatory animus.

At his deposition, Plaintiff testified that "some of the supervisors here and there . . . made little remarks" about his back condition.  (Pl.'s Dep. at 166-67.) Plaintiff could not identify any of those individuals by name, however.  (*Id*. at167-69.)  Moreover, he could not say that those individuals had anything to do with his termination from USS (*id*. at 171), and he has presented no evidence suggesting that they did.  Plaintiff asserts that USS did not like that he was on lifetime restrictions for his back injury, but acknowledged that no one ever told him this and claims he "just know[s] that that's why it [his termination] happened."  (*Id*. at 179.)  But " '[m]ere personal beliefs, conjecture and speculation are insufficient to support an inference … of discrimination.' "  *Wexler v. White's Fine Furniture*, 317 F.3d 564, 584 (6th Cir. 2003) (quoting *Chappel v. GTE Prods. Corp.*, 803 F.2d 261, 268 (6th Cir. 1986)).  Finally, Plaintiff presents no evidence to support his theory that Nurse Manager Lieb set out to get Plaintiff terminated to improve USS's statistics for reportable workplace injuries and lost time.[3]  In any event, Plaintiff does not contend that anyone else in Plant Medical was motivated by discriminatory animus.  Yet the decision to terminate him also was based on Dr.

---

[3] USS in fact reported Plaintiff's back and finger injuries on its OSHA reporting log and no lost time was attributable to Plaintiff's finger injury, as Dr. Ottoni returned Plaintiff to work with limited restrictions.

Madden's, Nurse Benitez's, and Assistant Nurse Toland's reports and statements concerning his behavior.

For these reasons, the Court concludes that USS is entitled to summary judgment on Plaintiff's disability discrimination claims (Counts I and II).

## B.   FMLA Violations

Plaintiff asserts that USS violated the FMLA by denying his request to see his own doctor, thus preventing him from obtaining treatment or care and certification from his doctor for further leave.  Plaintiff also asserts that USS, in violation of the FMLA, prevented him from calling in sick.

FMLA interference claims, such as Plaintiff's, arise under 29 U.S.C. § 2615(a)(1), which provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided in this subchapter."  To prove such a claim, a plaintiff must show: (1) he was an eligible employee; (2) the defendant was an employer as defined under the statute; (3) the employee was entitled to leave under the FLA; (4) the employee gave his or her employer notice of the intent to take leave; and (5) the defendant denied the employee FMLA benefits to which the employee was entitled.  *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006) (citing *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005)).  USS contends that Plaintiff's

26

FMLA claim fails because he was not entitled to leave under the statute and did not give notice of his intent to take FMLA leave.

As relevant to Plaintiff's condition, the FMLA entitles employees to leave "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The statute defines "a serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves-- (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." *Id*. § 2611(11). Because Plaintiff was not an inpatient in a hospital, hospice, or residential medical care facility, the inquiry is whether he had a physical condition involving continuing treatment by a health care provider.

As applicable to Plaintiff, regulations issued by the United States Department of Labor define "continuing treatment" as:

> A period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:(1) Treatment two or more times, within 30 days of the first day of incapacity, unless extenuating circumstances exist, by a health care provider, by a nurse under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or (2) Treatment by a health care provider on at least one occasion, which results in a regimen of continuing

27

> treatment under the supervision of the health care
> provider.

29 C.F.R. § 825.115.[4]  "The term incapacity means inability to work, attend school

or perform other regular daily activities due to the serious health condition,

treatment therefore, or recovery therefrom."  *Id.* § 825.113(b).  Plaintiff contends

that he was incapacitated for at least three consecutive days because "from July 24

to July 29, USS never returned him to his job (regular or restricted)[.]"  (Pl.'s Resp.

Br. at 32-33.)

Dr. Madden and Dr. Ottoni returned Plaintiff to work with restrictions on

July 26, however.  (*See* Def.'s Mot., Exs. 21, 26-27.)  In other words, Plaintiff's

health condition was not the reason he did not return to work.  Rather, it was

because of his suspensions and subsequent termination that Plaintiff was unable to

return to work at USS after his injury.  Plaintiff therefore fails to show that he was

entitled to leave under the FMLA.  As such, USS is entitled to summary judgment

with respect to Plaintiff's FMLA claim (Count III).

### C.    Workers' Compensation Retaliation

Plaintiff alleges that USS retaliated against him for exercising his rights

under the WDCA.  More specifically, in response to USS's summary judgment

motion, Plaintiff contends that he was terminated in retaliation for the assertion of

---

[4] Congress delegated to the Secretary of Labor the authority to "prescribe such
regulations as are necessary to carry out" the FMLA's general requirements for
leave.  29 U.S.C. § 2654.

28

his right to obtain necessary medical services under the WDCA.  (Pl.'s Resp. Br. at 22.)

The WDCA provides that an employer "shall not discharge an employee or in any manner discriminate against an employee … because of the exercise by the employee … of a right afforded by this act."  Mich. Comp. Laws § 418.301(13).  The WDCA affords an injured employee the right to reasonable medical care for work-related injuries:

> The employer shall furnish, or cause to be furnished, to an employee who receives a personal injury arising out of and in the course of employment, reasonable medical, surgical, and hospital services and medicines, or other attendance or treatment recognized by the laws of this state as legal, when they are needed.

Mich. Comp. Laws § 418.315(1).  However, the WDCA only affords an employee the right to treat with a physician of his or her own choice "*[a]fter 28 days from the inception of medical care*" and only where the employee gives his or her employer "the name of the physician and his or her intention to treat with the physician."  *Id*. (emphasis added).

The Michigan Supreme Court has acknowledged that, under the WDCA, "[t]he general rule [is] that the employer has a right to select the doctor who shall treat an injured employee."  *Gardner v. Michigan Sugar Co.*, 204 N.W. 100, 100 (Mich. 1925).  The Michigan Court of Appeals did not hold otherwise in *Cuddington v. United Health Services, Inc.*, 826 N.W.2d 519 (2012), which

29

Plaintiff cites in support of his claim.  (Pl.'s Resp. Br. at 22.)  In *Cuddington*, in response to the employee's claimed need for medical services, the employer did not offer to provide medical treatment but threatened to fire the employee if he did not report to work.  *Id.* at 521-22, 526.

For these reasons, the Court finds that Plaintiff was not asserting a right afforded to him under the WDCA when he failed to follow the directive to report to Plant Medical because he wanted to treat with his own physician.[5]  His WDCA retaliation claim based on the alleged interference with his attempt to see his own doctor therefore fails.

Plaintiff appears to be arguing as well that USS interfered with his right to receive certain benefits to which he was entitled under the WDCA for his finger injury, specifically, as Plaintiff explains, "entitle[ment] to at least half of 33 weeks of pay regardless of any actual time off work."  (*See* Pl.'s Resp. Br. at 24.) Plaintiff contends: "By re-characterizing the injury as a 'fracture,' scrubbing the medical records of mention of 'amputation,' and pretending as if [Plaintiff]

---

[5] In his response brief, Plaintiff also argues that he was denied the opportunity to call in "sick" on July 26.  (Pl.'s Resp. Br. at 23.)  Plaintiff fails to point to any provision within the WDCA granting an employee such a right and, in its review of the statute, the Court located no provision addressing such a right.  As such, Plaintiff cannot establish his WDCA retaliation claim based on this alleged interference.  Moreover, the facts do not support a finding that Plaintiff called in sick on July 26.  Instead, he indicated that he did not feel safe driving to Plant Medical on that date; however, he accepted USS's offer to send a taxi to bring him there.

continued to work, USS could potentially avoid liability for the otherwise automatic payments." (*Id*.)  Plaintiff claims these actions were motivated by Nurse Manager Lieb's bias against him.  There is no evidence, however, to support Plaintiff's claim of bias on the part of Lieb or his claim that his medical records were "scrubbed."  Plaintiff's medical records with USS reflect that he suffered a "partial amputation."  (*See, e.g.*, Def.'s Mot., Ex. 21 at Pg ID 715.)  Lieb's statement to USS's claims processor, Broadspire, "there is no amputation" related to Plaintiff's claim that his finger had been cut off: "[Claimant] advising Dr. Madden and others that Dr. Ottoni performed surgery to amputate his finger, when no such surgery was performed and there is no amputation."  (Pl.'s Resp., Ex. S, capitalization removed.)

For these reasons, the Court grants summary judgment to USS on Plaintiff's WDCA retaliation claim (Count IV).

## V.   Conclusion

For the reasons stated, the Court is denying Plaintiff's motion to strike certain exhibits attached to USS's summary judgment motion.  The notes admitted as Exhibit 32 are not offers to compromise and are admissible as a business record. The statements by Plaintiff and his union representatives in that record are not hearsay, as they are party admissions.  To decide USS's summary judgment

motion, the Court finds it unnecessary to consider the remaining exhibits Plaintiff seeks to strike.  Thus, the Court finds it unnecessary to rule on their admissibility.

Because the Court finds that USS is entitled to summary judgment with respect to Plaintiff's claims, even if it assumes that Plaintiff was disabled under the ADA, the Court is granting USS's motion for summary judgment and denying as moot Plaintiff's motion for partial summary judgment.

Accordingly,

**IT IS ORDERED** that Plaintiff's motion to strike Defendant's exhibits (ECF No. 48) is **DENIED IN PART AND DENIED AS MOOT IN PART**;

**IT IS FURTHER ORDERED** that Defendant's motion for summary judgment (ECF No. 39) is **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff's motion for partial summary judgment (ECF No. 40) is **DENIED AS MOOT**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: August 23, 2016

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, August 23, 2016, by electronic and/or U.S. First Class mail.

s/Keisha Jackson
Case Manager
